**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

**NICHOLAS FITZGERALD,** on behalf of
himself and all others similarly situated,

**Plaintiff,**

**v.**

**GANN LAW BOOKS, GANN LEGAL
EDUCATION FOUNDATION, INC.,** and
**MICHAEL PROTZEL,**

**Defendants.**

Civ. No. 2:11-04287(KM)(SCM)

**OPINION**

---

### INTRODUCTION[1]

The Telephone Communications Privacy Act ("TCPA") makes it unlawful
to send certain unsolicited advertisements to consumers by facsimile
transmission, *i.e.*, by fax. 47 U.S.C. § 227(b)(1)(C). In this case, the plaintiffs
have brought a class action against Gann Law Books, Inc., Gann Legal
Education Foundation, Inc., and Michael Protzel (collectively, "Gann"), alleging
violations of the TCPA.

---

[1] Citations to the record will be abbreviated as follows:

Defendants' Memorandum of Law in Response to Plaintiff's Motion for Final
Approval of the Class Settlement, No. 94, "Gann Brief".

Plaintiff Nicholas Fitzgerald's Memorandum of Law In Support of Its Motion for:
(1) Final Approval of the Class Settlement; (2) Class Attorney's Application for
Fees, Costs, and Expenses, and (3) An incentive Award for Plaintiff, No. 90-9,
"Fitzgerald Brief."

Settlement Agreement, No. 82-11, "Settlement Agreement."

Declaration of Ayatan Y. Bellin, No. 90-4, "Bellin Decl.".

Declaration of Jeffrey M. Eilender, No. 90-6, "Eilender Decl.".

Now before the Court is a proposed final settlement, which incorporates a substantial award of attorneys' fees. A class action offers significant procedural advantages, especially in a case like this one, where a defendant has allegedly committed a large number of relatively small violations. It affords a remedy for relatively modest claims that might not have been efficiently pursued one-by-one. And, by holding out the potential of an award of attorney's fees, it gives counsel the incentive to pursue widely-dispersed claims on behalf of class members who, by definition, are not present in court. With those advantages, however, come certain pitfalls. In social science jargon, class actions address a collective action problem, but, in doing so, may create externalities.

Generally, those externalities arise from the class representative's assertion of the presumed rights and interests of persons who are not present to speak for themselves. Arm's length bargaining and the best efforts of ethical counsel will often, perhaps usually, ensure that the settlement is fair to the class. When a settlement is in the offing and a fee is imminent, however, the interests of the class members may no longer have an unconflicted advocate. I intend no criticism of any attorney now before the court; I merely state a structural reality.

Class counsel here are to receive their fee from the $1,145,000 fund that is also the source of the cash component of the class members' recovery. True, the attorneys' efforts created that fund, but it is also true that every dollar of their fee comes at the expense of class members (if only those who will share the residue of the fund after claims, expenses, and fees). From the perspective of defendant Gann, the cash fund is a sunk cost; economically, it makes no difference to Gann whether the cash goes to class members or class counsel. The Court thus has a particular responsibility to look out for the interests of the absent class members and to monitor the settlement and the award of attorneys' fees for reasonableness.

This Court preliminarily approved class certification and the proposed Settlement Agreement. *See* ECF No. 85. On November 13, 2014, the Court held a fairness hearing, at which the parties addressed the final approval of the

2

settlement agreement; a $5,000 incentive award for the class representative; and attorneys' fees, costs, and expenses.

The settlement provides for two essential forms of relief: cash, payable from a fund that totals $1,145,000, and free continuing legal education ("CLE") webinars.[2] (Settlement Agreement ¶¶ 2(a) & (b)). More specifically:

(a) Class members who file a claim and attach a copy of the offending fax(es) will receive $175 per fax, up to a maximum of $875. *Id.* ¶ 10(a)).

(b) Class members who file a claim and do not attach a copy of the offending fax, but nonetheless include a declaration stating that at the relevant time, they owned the fax number to which an offending fax was sent, will receive an award of $125 per fax. *Id.* ¶ 10(b).

(c) Class members may additionally take either or both of two CLE webinars, which have a combined retail value of $230. *Id.* ¶ 2(a).

Any cash left in the fund after claims, fees, and expenses is to be distributed *pro rata* according to a specified scheme.[3] Class members agree to release Gann from further liability for unsolicited faxes sent to them during the class period. *Id.* ¶ 13(a).

I first consider the terms of the settlement, and find that they are fair and reasonable. I next consider a proposed $5000 incentive fee to the class representative, and likewise find it to be fair and reasonable. The proposed

---

[2]   A webinar is essentially a continuing legal education class conducted over the internet, rather than in person.

[3]   That distribution is discussed further at Part III.G, *infra*. Payments from the $1,145,000 cash fund are made first to cover administrative costs, the incentive award, and attorneys' fees and expenses. (Settlement Agreement, ¶ 1(a), 10(c), 10(d)). Next, the claims administrator pays the filed claims—here, the 303 claimants who produced either a copy of the offending fax or a declaration stating that they owned the fax number to which a fax was sent. *Id.* at ¶¶ 10(a) and 10(b). From the funds that remain, up to $125 per person is distributed to individuals who did not file a claim, but who (as determined by the claims administrator) owned a number to which an offending fax was sent. *Id.* at ¶¶ 10(c) and 8(a)(iii). If any money is left over after that distribution (not likely to be the case here), it is distributed *pro rata* to all three of the above categories of class members (*i.e.*, those who produced a copy of the offending fax, those who filed a declaration stating that they owned one of the fax numbers, and those whom the claims administrator determined to be the owner of one of the fax numbers in question). *Id.* at ¶ 10(e).

award of attorneys' fees, however, is excessive, and must be reduced from $1,008,763.33 to $421,577.

## I.  THE TERMS OF THE SETTLEMENT

Under Rule 23(e), a class action cannot be settled unless the court determines that the settlement is "fair, reasonable, and adequate." FED. R. CIV. P. 23(e)(2). When a court considers whether a settlement meets these criteria, it considers nine non-exhaustive factors:

(1) the complexity, expense and likely duration of the litigation;
(2) the reaction of the class to the settlement;
(3) the stage of the proceedings and the amount of discovery completed;
(4) the risks of establishing liability;
(5) the risks of establishing damages;
(6) the risks of maintaining the class action through the trial;
(7) the ability of the defendants to withstand a greater judgment;
(8) the range of reasonableness of the settlement fund in light of the best possible recovery;
(9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Girsh v. Jepson*, 521 F.2d 153, 157 (1975) (internal quotations and alterations omitted). Here, an examination of the *Girsh* factors yields the conclusion that this settlement is fair and reasonable. The Third Circuit has also identified additional factors that a court may, but need not, examine in evaluating a settlement. See *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 323 (3d Cir. 1998). I have considered all of these factors, as appropriate, and have concluded that the settlement is fair and reasonable.

*First factor.* The first *Girsh* factor considers the complexity, expense, and likely duration of the litigation. The factual issues here are concededly at the simpler end of the spectrum. It is nevertheless likely that continued litigation would be lengthy and expensive, particularly when considered in relation to the relatively modest amount of the individual claims. Gann has consented to class certification for the purpose of settlement, but has reserved its right to contest class certification if this settlement is not approved. *See* Settlement Agreement,

4

¶ 3. That issue alone might well require discovery and motion practice, adding time and expense to a matter that is already four years old. The settlement will deliver significant relief much more quickly. On balance, this factor favors, and certainly does not weigh against, settlement.

*Second factor.* The second factor considers the reaction of the class to the settlement. It is tempting to characterize it as "indifference." Relatively few class members—many of them attorneys[4]—filed a claim at all, but neither has there been any opposition. Of the 7,769 class members who were notified of the settlement, 303, or 3.7%, filed a claim. No class member objected, and only one opted out. The Third Circuit has held that a "vast disparity between the number of potential class members who received notice of the Settlement and the number of objectors creates a strong presumption that this factor weighs in favor of the Settlement." *In re Cendant Corp. Litig.*, 264 F.3d 201, 235 (3d Cir. 2001). This factor therefore favors settlement.

*Third factor.* The third factor asks the court to "determine whether counsel had an adequate appreciation of the merits of the case before negotiating a settlement." Courts will consider, *inter alia,* "the stage of the proceedings and the amount of discovery completed." *Girsh,* 521 F.2d at 157. There was considerable motion practice in New Jersey state court and before this Court. The settlement was reached with the help of a mediator. (Fitzgerald Brief, 5). Class counsel are involved in numerous TCPA class actions, and therefore could evaluate the settlement from an informed perspective. (Gann Brief, 5-6). All of these circumstances indicate that class counsel had an adequate appreciation of the merits of the case when they negotiated the settlement.

*Fourth factor.* This factor considers the risks the class would face in attempting to establish liability. Absent a settlement, class members would need to prove whether individual faxes violated the TCPA. That might involve

---

[4]      Inferably, the customers of Gann are predominantly attorneys or others in the legal field, who might be expected to recognize and understand the notice of settlement.

5

proof that the individual recipient did not authorize the fax (47 U.S.C. § 227(b)(C)(ii)), that any opt-out notices were not sufficient under TCPA, and that the fax qualifies as an advertisement (47 U.S.C. § 227(a)(5)). Such issues are mooted by this settlement, which permits recovery even by class members who no longer possess a copy of the offending fax. (Settlement Agreement, ¶ 10(b)). The risks of failing to establish individual claims, while not overwhelming, are real, and under this settlement they are minimized or eliminated. This factor therefore favors settlement.

*Fifth factor.* This factor considers the risks the class will face in proving damages. The TCPA provides for damages of $500 for each fax found to violate the Act. 47 U.S.C. § 227(b)(3)(B). Statutory damages thus follow a finding of liability as a matter of course. An award is subject to trebling to $1,500 if the plaintiff can prove that the defendant "willfully or knowingly" violated the TCPA. 47 U.S.C. § 227(b)(3). Trebling, however, is at the discretion of the court, and would require proof of the requisite intent, which may or not be forthcoming in an individual case. *Id.* And of course the relatively low ceiling on individual claims, even with trebling, might mean that such individualized proofs are uneconomical to pursue. This factor therefore favors settlement, if not strongly.

*Sixth factor.* This factor considers the risks of maintaining a class action through trial. I am satisfied that this class meets the requirements for certification in Rule 23(a), Fed. R. Civ. P. Gann would likely challenge class certification, but the factual and legal issues appear to be similar across the class. Class certification, while involving additional time and cost, would likely be granted even over a defense objection. This factor is therefore neutral at best.

*Seventh factor.* Class counsel are satisfied that "Defendants do not have the financial resources to satisfy a damages award that is significantly greater than what has been realized through this settlement." (Fitzgerald Brief, 26; Eilender Decl., ¶ 8; Bellin Decl., ¶ 6). There is some plausibility to this contention, but the parties have offered little evidence in support of it. Gann, a

6

legal publisher, has made a cash fund available from funds that appear to have come mostly from its insurance carrier. *See* Fitzgerald Brief, 46-47. I take counsel at their word, but this factor is not well-established enough as an evidentiary matter to strongly favor settlement.

 *Eighth and Ninth factors.* These factors consider the settlement in light of the best possible recovery and the attendant risks of litigation. Here, the best possible statutory recovery for a proven violation (assuming the court did not allow treble damages) would be $500 per unsolicited fax. 47 U.S.C. § 227(b)(3)(B). As I discuss elsewhere (*see* Part III.E, *infra*), the claimants are to receive a substantial portion of that value. Claimants can recover between $125 and $175 per fax in cash (up to a maximum of $875), and may, if they wish, receive an additional $230 worth of webinars. Such an award is reasonably proportional to the best possible recovery. Even class members who filed no claim at all—who most commonly receive nothing in class actions—will receive a residual share of cash here. Depending on administration costs, even those class members who did not file a claim may to receive up to $87 apiece.[5]

 To reject the settlement would pose various risks: the cost and delay of challenges to class certification, the difficulty of making a claim without presenting a physical fax, and the possibility of a finding that any given fax did not violate the TCPA. The statutory cap on damages means that further litigation has a limited, ascertainable upside.[6] Given those risks, and given the maximum statutory recovery, the recovery that this settlement provides is reasonable.

 *Prudential Factors.* The Third Circuit has also identified additional factors that a court may, but need not, examine in evaluating a settlement:

---

5 *See* Part III.G, *infra*.

6 Thus there is no need to make difficult judgment calls about the maximum amount of damages that is available as in, for example, a case involving tort claims for physical injury.

> the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

*Prudential*, 148 F.3d at 323. Examining these factors is not obligatory. See *In re Baby Products Antitrust Litig.*, 708 F.3d 163, 174 (3d Cir. 2013) ("Unlike the Girsh factors, each of which the district court must consider before approving a class settlement, the *Prudential* considerations are just that, prudential."). Not all of these factors are useful in evaluating this settlement, but a few of them are. The results achieved for claimants in this settlement constitute a substantial respectable percentage of what claimants could recover if they brought suit individually. *See* Part III.E, *infra*. I note, additionally, that the actual damages suffered by class members in this case are minimal to nonexistent, consisting perhaps of some wasted paper and ink. Any money recovered from the settlement should be more than enough to compensate class members for any loss they suffered.

The reasonableness of attorneys' fees is discussed in Part III, *infra*. Reduced in the manner I have prescribed, they are reasonable. I note also that in this case, the benefit of any reduction in attorneys' fees accrues directly to the class, reducing the danger of collusion between class counsel and the defendant. The claim procedures are simple, and make due allowance for those who have failed to retain what was, by hypothesis, an unwanted fax.

Based on the mandatory *Girsh* factors and, to some extent, the discretionary *Prudential* factors, I find that the settlement is fair and reasonable.

8

## II.   INCENTIVE AWARD

Class counsel propose that the named plaintiff, Nicholas Fitzgerald, be paid an incentive award of $5,000. (Fitzgerald Brief, 59). A district court has discretion to approve an incentive award to the representative plaintiffs in a class action lawsuit. *In re Janney Montgomery Scott LLC Fin. Consultant Litig.*, No. 06-3202, 2009 WL 2137224, at *12 (E.D. Pa. July 16, 2009). Such an award is intended to induce participation and to compensate the named representative for any risk undertaken or effort expended for the benefit of the class. *See Montgomery v. Aetna Plywood, Inc.*, 231 F.3d 399, 410 (7th Cir. 2000); *Varacallo v. Massachusetts Mut. Life Ins. Co.*, 226 F.R.D. 207, 257 (D.N.J. 2005).

Fitzgerald's duties with respect to this case were not particularly onerous. He reportedly attended seven hours of mediation, selected counsel, and "provided the documents necessary to prepare the Complaint" (presumably, the fax or faxes he received). (Fitzgerald Brief, 60). Joining this case entailed no significant amount of risk beyond the possibility of failing to recover statutory damages. On the other hand, however, the prospect of recovering a mere $500 might not entice an individual to take on the burden of being a class representative.

On balance, I am persuaded that an additional incentive payment is justified. The $5,000 incentive payment agreed to here seems to be of the same order of magnitude as those awarded in other TCPA cases. *See Grant*, 2014 WL 888665 at *2 ($5,000 incentive award); *Arthur*, 2012 WL 4076119 at *2 ($2,500 incentive award to each class representative); *Lo*, 2012 WL 1932283, at *4 ($1,500 incentive award); *Rose*, 2014 WL 4273358 at *13 ($2,000 incentive award).

For those reasons, I will approve an incentive award to the class representative, Mr. Fitzgerald, in the amount of $5,000.

## III.   ATTORNEYS' FEES

### A. The $1 Million fee award claimed by class counsel under the proposed settlement

Under the proposed settlement, defendant Gann has agreed to create a cash fund of $1,145,000 and to make $1,881,290 worth of webinars available to claimants. The Settlement Agreement proposes that the value of the settlement be distributed as follows:

(a) **$53,625** in cash will be distributed to some 303 claims. (Fitzgerald Brief, 12-13).

(b) **$5,000** in cash will be paid to the named representative as an incentive award.

(c) **$1,008,763.33** in cash will be paid to class counsel. (This would cover attorneys' fees as well as $15,599.19 in expenses.)

(d) **$77,611.67** (the residue of the cash fund), less administration costs, will be distributed pro rata to all class members for whom the claims administrator has a valid address who did *not* file a claim.

(e) **$49,680** worth of Gann continuing education webinars will be furnished gratis to the 216 class members who requested this additional non-cash benefit. (Fitzgerald Brief, 13).

(f) **$1,831,610** worth of webinars will go unredeemed, effectively "reverting" back to Gann.

Three features of counsel's fee request deserve emphasis.

First, plaintiffs' counsel arrived at its attorneys' fee request of $1,008,763.33 (item (c), above) by calculating a contingent fee of one third (33%) of a total settlement value of $3,026,290. That method of calculation is twice flawed. First, a 33% fee is high in comparison to settlements approved in other TCPA cases. Second, and more fundamentally, that total settlement value figure is inflated, because it includes the value of non-cash benefits that the participants surely suspected, and now know, the defendant will never pay. The total settlement value of $3,026,290 comprises $1,145,000 (the cash fund)

plus $1,881,290 (the theoretical cash value of the webinars if given to *all* class members). But the webinars will not be furnished to all 8,000 class members; they will be furnished to 216 claimants. Those 216 webinars have a value of $49,680, not $1.8 million. *See* Parts III.B, III.C, *infra.*

Second, class counsel's proposed fee represents nearly five times the value of the time it devoted to the case. According to class counsel's records, their hourly billings— the "lodestar"—come to just $210,788.50. (Fitzgerald Brief, 57). The claimed fee of $1,008,763.33 amounts to 4.78 times those actual hourly billings.[7] That multiplier, 4.78, is far higher than those typically approved in TCPA cases. *See* Part III.B, *infra.*

Third, the claimed attorneys' fees are just over $1 million, and the recovery of the class is just over $180,000.[8] Thus the payment to the attorneys dwarfs, not just the benefits to individual class members, but the aggregate benefit to the class itself. That in itself is not disqualifying, but it is a factor I will consider. *See* Part III.D, *infra.*

Tentatively, then, I have concerns that the fee award sought by class counsel may be disproportionate. I now discuss what level of fees would be reasonable. In doing so, I address the seven factors that Third Circuit courts consider in assessing the attorney fee award in common fund cases:

> (1) the size of the fund created and the number of persons benefitted;
> (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel;
> (3) the skill and efficiency of the attorneys involved; (4) the complexity

---

[7]     That is not the basis on which class counsel calculated the fee; it seeks one third of what it regards as the total settlement value. But a lodestar calculation is an equally valid measure, or alternatively may be used as a reality check on a percentage contingent fee. *See In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 305 (3d Cir. 2005) (as amended Feb. 25, 2005).

[8]     The value that class members actually receive would be, at most, $180,916.67 ($53,625 cash distribution to claimants; plus $49,680 worth of webinars to claimants; plus the residual $77,611.67, less administration costs, distributed pro rata to those class members who did not file a claim). (Fitzgerald Brief, 13). That calculation assumes, *inter alia,* that class counsel are awarded the fee that they propose. If the fee were lower, more of the cash fund would remain available to the class. *See* Part III.G, *infra.*

> and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.

*In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 301 (3d Cir. 2005) (as amended Feb. 25, 2005).

## B. The lodestar multiplier and contingent fee percentage compared to other TCPA class action settlements.

I first consider the contingent fee percentage and the lodestar multiplier, aspects of the settlement perhaps most relevant to *Rite Aid* factors six and seven (amount of time devoted to the case by plaintiffs' counsel and the awards in similar cases). The hourly-billing lodestar multiplier (here, 4.78) is a valuable "reality check" and basis for comparison even where (as here) counsel have calculated their fee on a contingent basis. *See Rite Aid*, 396 F.3d at 301. I also compare the 33% contingent fee percentage to percentages awarded in other cases. Taking the two methods together, the court may be more confident that a proposed fee is reasonable when the lodestar multiplier fee and the contingent fee come to rest in a kind of equilibrium.

In the lodestar multiplier method, the "lodestar" refers to the amount the attorneys actually billed on the case: *i.e.*, the number of hours worked multiplied by the hourly rate. Billing at the hourly rate, however, may understate such factors as the risk of litigation, the benefit to the class, and the need to give an incentive to plaintiffs' counsel. Hence the "multiplier." The multiplier is a factor by which the hourly billing lodestar is multiplied to arrive at class counsel's fee award. *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 732 (3d Cir. 2001). If, for example, counsel's hourly billing amounted to $10,000, and the lodestar multiplier were set at 1.5, the fee award would be $15,000. To select a multiplier (or assess the reasonableness of a proposed multiplier), courts have considered a number of factors: the quality of representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of non-recovery. *Rose v. Bank of Am. Corp.*, 2014 WL 4273358, at *6 (N.D. Cal. Aug. 29, 2014).

12

As noted above, class counsel here billed time at their usual rates totaling $210,788.50. Net of expenses, the requested fee of $1,008,763.33 comes out to 4.78 times counsel's hourly billings. In other words, the requested fee, although calculated on a contingent basis, is equivalent to a lodestar-method award using a multiplier of 4.78.

I have surveyed class action settlements approved in other TCPA cases. Most involved lodestar multipliers significantly lower than 4.78. *See Grannan v. Alliant Law Grp.*, P.C., No. C10-02803 HRL, 2012 WL 216522, at *1 (N.D. Cal. Jan. 24, 2012) (multiplier of 1.47), *Rose*, 2014 WL 4273358, at *1 (multiplier of 2.59); *Harris*, 2011 WL 4831157, at *7 (multiplier of 1.375); *Michel v. WM Healthcare Solutions, Inc.*, No. 1:10-cv-638, 2014 WL 497031, at *2 (S.D. Ohio Feb. 7, 2014) (multiplier of 1.8); *Vandervort v. Balboa Capital Corp.*, No. SACV 11-1578-JLS, 2014 WL 1274049 (C.D. Cal. Mar. 27, 2014) (multiplier of 2.52); *Grant v. Capital Mgmt. Servs., L.P.*, No. 10-CV-2471-WQH BGS, 2014 WL 888665, at *1 (S.D. Cal. Mar. 5, 2014) (multiplier of 0.8); *Bellows v. NCO Financial Systems, Inc.*, No. 07-cv-1413, 2009 WL 35468 (S.D. Cal. Jan. 5, 2009) (multiplier of 1.793); *Arthur v. Sallie Mae*, No. 10-cv-0198, Doc. 225, Motion for Award of Attorneys' Fees and Costs, (May 17, 2012) (multiplier of 2.71); *Ritchie*, 2014 WL 3955268, at *3 (multiplier of 1.56).

Class counsel here calculated their fee as a one third, or 33%, contingent fee based on the alleged value of the settlement.[9] A 33% recovery rate would be at the high end of what courts typically approve in TCPA cases. *See, e.g., Michel*, 2014 WL 497031, at *2 (court reduced the attorney fee award from one-third to 15%); *Lo v. Oxnard European Motors, LLC*, No. 11CV1009 JLS MDD, 2012 WL 1932283, at *1 (S.D. Cal. May 29, 2012) (attorneys' fees were 25% of the settlement fund); *Arthur*, 2012 WL 4076119 at *2 (19% of settlement); *Ritchie*, 2014 WL 3955268, at *3 (28% of settlement). Indeed, in the Ninth Circuit, the "benchmark" for a reasonable fee award in any common fund case

---

[9]     The value of the settlement is overstated, but I set that aside for now. *See* Part III.C, *infra.*

(TCPA or otherwise) is 25%. *See In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011). The Eleventh Circuit has instructed district courts to use a range of 20%-30% as a benchmark for contingency awards in common fund cases. *Waters*, 190 F.3d at 1294.

I do not mean to say that a 33% contingent fee rate in a TCPA case is wholly unprecedented. Such a percentage was approved in *Vandervort*, 2014 WL 1274049, at *7. The *Vanderwort* court, however, justified the award in relation to several unusual factors present in that case. It was, for example, "the first case in which a court certified a nationwide class of recipients of fax advertisements allegedly violating the opt-out provisions of the TCPA." *Id.* at *4. In addition, the Ninth Circuit law was unsettled as to a defense that the defendant raised regarding substantial compliance. The damages award could have triggered due process concerns, because claims could be based on either solicited or unsolicited faxes, irrespective of any established relationship between the defendant and the claimant. The defendant had vigorously opposed the case, which had required a "high degree of skill to litigate successfully." *Id.* at *7.

In *Vandervort,* moreover, the 33% award was proportional to the effort expended. It corresponded to a lodestar multiplier of 2.52 (not 4.78, as in this case). The payout to the class, too, was substantial and proportional. The attorneys' fees in *Vandevort* were about $1.1 million (very close to the $1.08 million claimed here). There, however, the amount paid out either to class members or to a *cy pres* fund was about $2.1 million. Under Class counsel's proposal here, the actual payout of monetary and webinar benefits to the class is a fraction of that amount, around $181,000. *See* Part III.D, *infra*.[10]

---

[10]     One court approved a settlement where the class members received no cash payments at all, but only injunctive relief. *See Grant*, 2014 WL 888665 at *1. For a three year period, the defendant agreed to refrain from making autodial or recorded message calls to any cell phone. *Id.* at *2. Here, Gann has agreed to refrain from sending faxes that violate the TCPA. Settlement Agreement, ¶ 4. However, the *Grant* settlement did not extinguish the class members' individual claims for monetary relief or other recourse. *Id.* at *4. This settlement, in contrast, releases the Defendants from

14

Finally, as I discuss in Part III.C, *infra*, the true total value of this settlement is not $3 million, but approximately $1,194,680. Viewed from that perspective, the proposed attorneys' fees award of $1.08 million represents, not 33%, but approximately 84% of the settlement's value. And an 84% contingent fee is unreasonable by virtually any standard.

In sum, whether calculated as a lodestar multiplier of hourly billings, or as a contingent fee, the $1.08 million fee proposed here is an outlier when compared to awards approved in other TCPA cases.

### C. The inflated $3 million dollar value of the settlement must be reduced to account for the unclaimed portion of the non-cash award, which effectively reverts to the defendant.

The first *Rite-Aid* factor, the "size of the fund created," requires particular attention here. I conclude that class counsel's valuation of the settlement at over $3 million is inflated. The locus of that inflation is the portion of the award that consists of free continuing education webinars. There is nothing wrong, of course, with furnishing all or part of the benefit of a settlement in a form other than cash. As class counsel point out, most members of this class are probably attorneys, and New Jersey attorneys at that. Our State, like many others, requires attorneys to take continuing legal education courses. Such a webinar, furnished at no charge, confers a genuine benefit.[11] The inflation comes in because it is a benefit *only* to the small minority of class members who have redeemed the offer. In short, to those who claim it the benefit is real, but to non-claimants (about 97% of the class) it is purely theoretical.

The proposed fee of $1,008,763.33 represents one third of the alleged total value of the settlement: $3,026,290.00. That "total value" was calculated by adding the cash fund ($1,145,000) plus the alleged value of the webinars

---

liability for any unlawful faxes during the class period. *Id.*, ¶ 13. It is therefore hard to draw any meaningful comparison between that case and this.

[11]    Thus it is far superior to, *e.g.*, offering the claimant more of a product that was the basis of the consumer's dissatisfaction in the first place.

($1,881,290). [12] The alleged value of the webinars, however, is based on the very unrealistic assumption that every single member of the class would claim the webinar benefit. (Fitzgerald Brief, 1-2). In fact, from a potential field of about 8,000, only 216 class members *actually* submitted claims for the webinar benefit. So, of the theoretical $1,881,290 value of the webinars, class member claimants are *actually* to receive only about $49,680. $1,881,290 minus $49,680 equals $1,831,610. That $1,831,610—the lion's share of the value of the webinar benefit—is a phantom. It will never be supplied by Gann and will never be received by the class. Yet it makes up over 60% of the total settlement value ($3,026,290) on which class counsel base their contingent fee calculation. Its sole function at this stage of the case is to pump up the denominator of the contingent-fee ratio.[13] *See* Part III.B, *supra*.

A more appropriate starting point for a contingency fee analysis is the benefit *actually* conferred: the $1,145,000 in cash, plus the $49,680 in webinars actually redeemed by claimants. That amounts to a total settlement value of $1,194,680. That measure of the settlement value is appropriate for three reasons: First, it is consistent with Congress's preference as expressed in the Class Action Fairness Act ("CAFA"). Second, it excludes the portion of the settlement value that effectively reverts to Gann. And third, it is consistent with precedent and lies within the court's broad discretion, even under the cases cited by Class counsel.

### 1.   *The Class Action Fairness Act*

I consider the Class Action Fairness Act's treatment of attorneys' fees in class action settlements that provide relief in the form of "coupons." That approach does not mandate a result here, but it is highly suggestive.

---

[12]   Based on the fee that Gann would ordinarily charge a customer to enroll in the webinars.

[13]   To look at it another way, Class counsel contend that the total settlement value ~~is $3 million and that their fee should be 33% of that. The total settlement value~~ comprises 40% cash and 60% (mostly unclaimed) benefits —but counsel propose to be paid 100% cash.

16

CAFA mandates that fees should be calculated based on the value of the coupons *redeemed,* not the value of the coupons *issued.*

> (a) contingent fees in coupon settlements - If a proposed settlement in a class action provides for a recovery of coupons to a class member, the portion of any attorney's fee award to class counsel that is attributable to the award of the coupons shall be based on the value to class members of the coupons that are redeemed.

28 U.S.C. § 1712(a). Otherwise, the Act directs the Court in a coupon case to be guided by counsel's hourly billing:

> If a proposed settlement in a class action provides for a recovery of coupons to class members, and a portion of the recovery of the coupons is not used to determine the attorney's fee to be paid to class counsel, any attorney's fee award shall be based upon the amount of time class counsel reasonably expended working on the action.

28 U.S.C. § 1712(b)(1).

Congress also told the court what to do in the case of a mixed settlement that provides for both coupon relief and equitable, or injunctive, relief. The coupon-relief portion of the attorneys' fee should be based solely on the value of the coupons actually redeemed, and the equitable-relief portion should be based on the attorneys' actual billing. 28 U.S.C. § 1712(c).

Congress did not explicitly address the possibility most analogous to the settlement here: a combination of coupon relief and money damages. One likely reason: by directing the court to consider the value of redeemed coupons only, the Act has already reduced the coupons to cash, which may simply be added to any other cash in the settlement. In effect, this would be treated as a cash settlement, not a "mixed" settlement at all.

I do not go so far as to hold that the fee proposed here is barred by the CAFA "coupon" provisions. Arguably, for example, an "entire product" (here, a webinar) is distinguishable from a "coupon" benefit. *See Synfuel Technologies, Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 654 (7th Cir. 2006) ("We recognize that the pre-paid envelopes are not identical to coupons, since they

17

represent an entire product, not just a discount on a proposed purchase."). One objection to coupon settlements—typically, in effect, a discount on defendant's product[14]—is that they force the class member to make an additional purchase to get any benefit from the settlement. *See Synfuel*, 463 F.3d at 654; *Fleury v. Richemont N. Am., Inc.*, No. C-05-4525, 2008 WL 3287154, at *2 (N.D. Cal. Aug. 6, 2008). That is not the case here. A claimant in this settlement can receive a webinar free of charge, and need not transact any additional business with Gann.

I nevertheless find the policy behind the CAFA requirements to be suggestive and instructive. The policy that infuses CAFA is that the attorneys' fee award should be based on benefits *actually* claimed and recovered by the class. *See In re Baby Products Antitrust Litig.*, 708 F.3d 163, 179 n. 13 (3d Cir. 2013) (CAFA "further supports the proposition that the actual benefit provided to the class is an important consideration when determining attorneys' fees"). That policy suggests that the better course here is to base the attorneys' fee award upon the webinars actually claimed, not on those made theoretically available.

## 2. The problem of "reversionary" funds

A second problem with class counsel's calculation of total settlement value is that the unclaimed portion of the webinar benefit, valued at $1,831,610, will effectively revert to Gann. That reversion of funds to the defendant creates a potential discrepancy—I mean the discrepancy between a big settlement and a big-*sounding* settlement. To collapse that discrepancy, settlements will typically provide that any unclaimed portion of settlement funds be distributed *pro rata* (or, failing that, paid into a *cy pres* fund), for the direct or indirect benefit of the class. *See, e.g., Ritchie v. Van Ru Credit Corp.*,

---

[14]     Even if the coupon is for a set dollar amount, rather than a percentage discount, it will often be set at an amount that is less than the full purchase price of defendant's products. Thus it will require the claimant to lay out money to realize the benefit of the coupon settlement.

18

No. 2:12-CV-01714-PHX-SM, 2014 WL 3955268, at *3 (D. Ariz. Aug. 13, 2014) (After deducting attorneys' fees, administration costs, and incentive payment from $2.3 million settlement fund, remainder to be divided pro rata among all class members who submitted a claim).

The $1,145,000 cash fund in this case does not present a reversion problem. The entire cash amount is earmarked for attorneys' fees, claims, and expenses, with the residual unclaimed value to be distributed to class members. No portion will revert to defendant Gann.

As to the webinar benefits, however, the situation is very different. The value of unclaimed webinars will *not* be distributed to class members (assuming such a thing would even be possible). Gann has not forever forfeited the $1,881,290 value of the webinars that it made available. Of that total, Gann will pay out a paltry $49,680. The remaining value of $1,831,610 effectively reverts to (or remains with) Gann; it does not go to benefit the class. Approximately 60% of class counsel's $3 million "total settlement value," on which its proposed fee is based, consists of the phantom value of webinars that will not be furnished to any class member, but retained by Gann.

Courts have cast a skeptical eye on settlement value that reverts to the defendant to the (very likely) extent that less than 100% of the class submits claims. For instance, in *Strong v. BellSouth Telecommunications, Inc.*, 137 F.3d 844 (1998), the settlement provided that claimants could receive a credit on their telephone service bills. If every class member claimed the credit, the total value would be $64 million. *Id.* at 848. Based in part on this $64 million settlement value, counsel requested a fee totaling $6 million. *Id.* at 850. But not every class member claimed the credit, and the settlement provided that any funds left unclaimed would revert to the defendant. *Id.* at 852. Based on actual claims made, the credit produced a benefit to class members, not of $64 million, but only about $1.8 million. *Id.* at 851. Because the fee application was substantially based on value that would never be redeemed, the district court disapproved it, and the Court of Appeals upheld that decision. *Id.* The $64

19

million figure was a "phantom," and it was not an abuse of discretion to instead consider the "actual results of the settlement." *Id.* at 852-53.[15]

In *Harris v. Vector Mktg. Corp.*, No. C-08-5198 EMC, 2011 WL 4831157 (N.D. Cal. Oct. 12, 2011), class counsel proposed a contingent fee award based on a total settlement value of approximately $13 million. Cash payments, however, went only to class members who filed a claim. Unclaimed funds would not be distributed to the class *pro rata*, but would instead revert to the defendants. 2011 WL 4831157 at *5. In the court's view, that $13 million "settlement value" was therefore "largely illusory," and an attorney fee based on that illusory value was inherently flawed. *Id.* The *Harris* court rejected the proposed settlement entirely. *Id.* at *7.

The Seventh Circuit made a similar observation in *Pearson v. NBTY, Inc.*, No. 12-1245, 2014 WL 6466128 (7th Cir. Nov. 19, 2014). There, class counsel justified its proposed fee in reference to a total settlement value of $20.2 million. That settlement value, however, represented the defendant's obligation in the unlikely event that every one of the 4.73 million class members submitted a claim. Such a number, the Seventh Circuit held, had "barely any connection to the settlement's value to the class." *Id.* at *2. A more appropriate measure of the settlement's value, said the court, would have to start from the amount the class members would *actually* receive. That actual, reality-based figure is the appropriate denominator for purposes of assessing the reasonableness of attorneys' fees.[16]

---

[15]    Indeed, the Fifth Circuit cited with approval the district court's "likening this aspect of the settlement to settlements providing class members with coupons or certificates, where the true value of the award was less than its face value." *Id.* at 852. *See* discussion of coupon settlements in Part III.C.1, *supra.*

[16]    Other relevant cases include *Americana Art China Co. v. Foxfire Printing & Packaging, Inc.*, 743 F.3d 243 (7th Cir. 2014), which involved a proposed fee based on a recovery that was theoretically available, but not actually paid. There, the terms of the settlement agreement made $6.1 million available to claimants. *Id.* at 245. Of that total, "over $2 million" was earmarked for attorneys' fees and incentive awards. *Id.* The remaining $4 million was available for the payment of claims, but anything left over would revert to the defendants. *Id.* Based on claims actually submitted, not $4 million, but only $397,426.66 was to be awarded to class members. *Id.* Thus the attorneys

These cases, too, argue against the propriety of basing an award on the portion of a class recovery that will actually revert to the defendant, rather than benefit the class.

### 3.    The discretion of the court

More generally, I consider the fairness of what Class counsel propose with respect to the size of the fund and the number of persons benefited. I do not hold that reversionary funds may never be considered in any way. But I do examine whether including unredeemed funds results in a calculation of the total settlement value that is just and fair to the absent class members. In that connection, I consider the scope of the court's discretion under case law cited by Class counsel.

Class counsel have cited several cases for the proposition that a district court should use the total settlement value, irrespective of actual claims, in calculating a contingent fee. The cases do not apply here, for two reasons. First, this settlement differs in important respects from the settlements in the cited cases. Second, the cited cases establish, at best, that a court may consider reversionary funds—not that it must do so.

For example, in *Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980) (Fitzgerald Brief, 41), the settlement fund was not reversionary. There, the defendant created a cash fund, from which attorneys' fees were deducted. *Id.* at 476. Claims were satisfied from the remainder of the fund. *Id.* There was no

---

sought a $2 million award for securing a class recovery of just under $400,000. The district court reduced the attorneys' fees to $1,147,698. *Id.* While the district court had not relied on the discrepancy between the attorneys' fee and the actual recovery, the Court of Appeals pointed out that it would not have been an error to do so. *Id.* at 247. *See also LaGarde v. Support.com, Inc.*, No. C12-0609, 2013 WL 1283325, at *8, *12 (N.D. Cal. Mar. 26, 2013) (finding that the proposed attorneys' fee should be evaluated in comparison to "the actual payout" from the full settlement fund, rather than the value that defendants made available in settlement); *Sylvester v. CIGNA Corp.*, 369 F. Supp. 2d 34 (D. Me. 2005) (rejecting two different settlements where the attorneys' fees were calculated based on the total amount made available to the class but, based on claims submitted, the actual payout to the class would be comparatively low).

provision for unclaimed funds to revert to the defendant. *See id.* at 481 n.5
("Nothing in the court's order made Boeing's liability for this amount contingent
upon the presentation of individual claims."). *See also Van Gemert v. Boeing
Co.*, 590 F.2d 433, 436 (2d Cir. 1978) (Court of Appeals decision, further
describing the settlement fund). In short, Boeing's liability was fixed, regardless
of how many claims were ultimately filed. *Boeing* permitted a fee award based
on the entire value of the fund. But the Court, as it explicitly recognized, did
not face the issue presented here: "Thus, we need not decide whether a class-
action judgment that simply requires the defendant to give security against all
potential claims would support a recovery of attorney's fees under the common-
fund doctrine." *Boeing*, 444 U.S. at 481.

A Third Circuit case that class counsel cites, *In re Baby Products
Antitrust Litig.*, 708 F.3d 163, 175 (3d Cir. 2013), actually supports the
approach I take here. There, the court considered in dictum whether amounts
distributed *cy pres* should be considered part of the total settlement value in
calculating a contingency fee. *Id* at 177-180. It imposed no *per se* rule: "We
think it unwise to impose...a rule requiring district courts to discount
attorneys' fees when a portion of an award will be distributed cy pres...We
appreciate, however, that awarding attorneys' fees based on the entire
settlement amount rather than individual distributions creates a potential
conflict of interest between absent class members and their counsel." *Id.* at
178. Thus *Baby Products* is not *contra* authority, but an *a fortiori* case. That is,
*even where funds do not revert to defendant,* but are applied to the indirect
benefit of the class through a *cy pres* fund, it may be appropriate to exclude
them from consideration in the total settlement value. *Id.* at 179 ("our
approach is case by case, providing courts discretion to determine whether to
decrease attorneys' fees where a portion of a fund will be distributed *cy pres*").

*Baby Products* recognized that *Boeing* did not settle, either way, the
permissibility of a fee based only on amounts actually distributed to the class.
*Id.* at 177. It is clear, however, that the *Boeing* holding applies at best to the

22

$1.145 million cash fund, which does not revert to Gann under any circumstances. It has little to say about the unclaimed webinar benefits.

There is a case from this district that that based attorneys' fees (in part) on a total settlement value, despite a reversionary provision, but it is highly distinguishable. *McCoy v. Health Net, Inc.*, 569 F. Supp. 2d 448, 451 (D.N.J. 2008) (Hochberg, J.), involved allegations that a health insurer had underpaid health care providers for services. In some cases, patients were balance-billed for the difference between what the provider charged and what the insurer paid. *Id.* at 450-451. The *McCoy* settlement agreement, approved by Judge Hochberg, comprised four parts: a $15 million cash fund, a $160 million cash fund, a $40 million cash "prove-up" fund, and injunctive relief that the court valued at $26 million. *Id. at* 478. The first two funds, totaling $175 million, would be distributed to class members and would not revert to defendants. *Id.* at 453. The $40 million "prove-up" fund was reserved for future claims, with any leftover balance to revert to defendant.

In *McCoy*, the portion that could even potentially revert to defendant amounted to about 16% of the settlement value. *See* 569 F. Supp. 2d at 452, 478. Because claims lay in the future, the amount if any, that would actually revert was unknown. Here, by contrast, approximately 62% ($1,881,290 out of $3,026,290) of the settlement value is potentially reversionary. And reserves for future claims are not an issue here, as they were in *McCoy*; we now know the precise value of the benefit that will revert to Gann, which amounts to $1,831,610 of unclaimed webinars, or about 60% of the claimed total settlement value.[17]

Class counsel cite two out-of-Circuit cases in which unclaimed funds that reverted to defendants were nevertheless included in the settlement value. *Williams v. MGM-Pathe Commc'ns Co.*, 129 F.3d 1026 (9th Cir. 1997); *Alleyne v Time Moving & Storage Inc.*, 264 F.R.D. 41 (2010). I am unconvinced by their

---

[17] The settlement value in *McCoy*, including the reversionary fund, resulted in a multiplier of "just under 2.3." 569 F. Supp. 2d at 479. Here, class counsel's proposed fee results in a multiplier of 4.78, more than twice as high.